[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 14, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10554
Non-Argument Calendar

_____

Agency No. A77-007-400

SORAIDA HENAO NUNEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 14, 2008)**

Before ANDERSON, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Soraida Henao Nunez, a native and citizen of Colombia, petitions this court

for review of the Board of Immigration Appeals' ("BIA") affirmance of the

Immigration Judge's ("IJ") order of removal and denial of withholding of removal. After a thorough review of the record, we deny the petition.

Nunez entered the United States in 1999 without being admitted or paroled, and the INS charged her with removability under INA § 212(a)(6)(A)(i); 8 U.S.C. § 1182(a)(6)(A)(i). In 2002, Nunez filed an application for asylum, withholding of removal, and relief under the CAT, alleging that she had been persecuted on account of her political opinion.[1]

At the removal hearing, Nunez testified as follows: Nunez's family operated a funeral home in Cali, Colombia. The home had a contract with the government to perform funeral services for military personnel. The family disagreed with the agenda of guerilla organizations such as FARC, and thus refused to perform funeral services for any guerillas. Nunez's family would determine if someone was a guerilla by the way the person died. Nunez experienced her first problem with FARC on July 7, 1999. As Nunez and her mother were opening the funeral home that morning, three men entered and demanded to know where Nunez's brother Alexander was. Nunez said he was not there, and the men threatened her and insulted her, telling her that they would "beat her today and kill her

---

[1] The IJ and BIA determined that the application was untimely. This court has dismissed the petition to the extent that it challenges this determination. In addition, Nunez did not challenge the denial of CAT relief before the BIA, and she does not raise it in her petition for review. Thus, the issue is not exhausted and abandoned. Fernandez-Bernal v. U.S. Att'y Gen., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

tomorrow." The men slapped her in the face, and when she fell to the ground, they kicked her twice in the leg. The men also beat her mother before they left. Nunez was pregnant at the time and started to bleed. She and her mother went to the hospital. Nunez did not have a medical report because the hospital records were not computerized. After the attack, Nunez hid at home for a week and then came to the United States. She then learned that her family had received several threatening calls from FARC, but that her family had not told her of these problems because they did not want to worry her. After she fled Colombia, her family received a condolence card and wreath. Then, on July 23, 2001, her brother was kidnaped by FARC, held for about two hours, and beaten. Neither Nunez or her brother went to the police because the police had been infiltrated and were corrupt. Friends in the military told the family that they had obtained a copy of a hit list, which included the names of Alexander and his uncle. In 2002, the uncle was shot and killed. Nunez feared that she would be killed if she returned to Colombia because FARC never forgot and the threat was country-wide.

Alexander Henao testified to the following: The family had the contract for military funerals since 1992. In 1998, they began to receive calls from FARC warning them to stop military funerals. Between 1998 and 2001, Alexander received 23 threatening calls. In 1999, his sister and mother were beaten. In 2001, Alexander's car was intercepted and he was taken to another location where he was

3

threatened and beaten. He was able to escape when some men approached and the kidnappers ran away. Alexander then learned from his military friends that he and his uncle were included on a list of people to be killed. Alexander did not go to the police because they were corrupt. Instead, he sold the business to a friend who was later killed. In December 2001, FARC members warned the uncle that they were still looking for Alexander and his family. Alexander explained that he never told Nunez of the problems, even when she wanted to return to visit their sick father, because he did not want to worry her.

In support of the asylum application, Nunez submitted several articles on FARC and the 2005 State Department Country Reports on Human Rights. None of the articles or reports were specific to the events Nunez and Alexander described. Nunez also submitted the death certificates for her uncle and the man who bought the funeral home. Additionally, she submitted letters from her mother and her aunt dated 2005, referring to threats the family continued to receive, and statements from two family friends, Alberto Garcia and Leyda Sandoval. Garcia stated that he knew Nunez and knew that FARC came to the funeral home. He stated that Nunez had been beaten, leaving bruises on her body and face. Sandoval stated that she knew Nunez and her mother had been beaten by FARC and taken to the hospital for treatment. Sandoval had attempted to get the medical records for Nunez, but was told the records were not available because the hospital was not computerized.

4

Finally, Nunez submitted Alexander's asylum application and notice of relief from removal.

The IJ denied relief, questioning the lack of corroborating evidence from the hospital and to confirm the circumstances of the uncle's death, and noting that Nunez's several trips to Colombia negated her fear of harm. The IJ found that the reasons given for allegedly not telling Nunez of the threats were not credible. On the merits, the IJ noted that the family had a contract with the government since 1992, but did not experience any issues with FARC until 1998, and Nunez suffered only a single incident. He further noted that the family had friends in the military and in government, but did not seek assistance once the threats began. The court gave no weight to the letters from family and friends, as they were vague, general, and contradicted the testimony.

Nunez appealed to the BIA, which affirmed, finding that the evidence was insufficient to establish entitlement to withholding of removal. The BIA explained that Nunez's decision to return to Colombia twice after the threats began and the three-year wait to file for relief undermined her claims. The BIA pointed to the weaknesses in the claims, and noted that the corroborating evidence was

insufficient. The BIA noted that Nunez had not challenged the IJ's findings that the corroborating evidence was deficient.[2] This petition for review followed.

We review only the decision of the BIA, except to the extent that it expressly adopts the IJ's opinion. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007). We review legal conclusions de novo and factual findings under the substantial evidence test.[3] Adefemi v. Ashcroft, 386 F .3d 1022, 1026-27 (11th Cir. 2004) (en banc). "Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Id. at 1027. The fact that evidence in the record may support a conclusion contrary to the administrative findings is not enough to justify a reversal. Id. Rather, reversal is only appropriate where the record "compels" it. Id.

---

[2] Nunez also argued that she was denied the opportunity to rebut the government's argument at the removal hearing. The BIA concluded that Nunez had not shown that she was unable to rebut the government's argument or how she was prejudiced. Nunez does not raise this issue in her petition for review; thus, it has been abandoned. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

[3] In considering a petitioner's claim for withholding of removal, the IJ must determine credibility in the same manner as in asylum cases. See 8 U.S.C. § 1231(b)(3)(C); 8 U.S.C. § 1158(b)(1)(B)(ii)-(iii). IJs must make "clean determinations of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). Here, although the IJ explained that he found certain explanations to lack credibility, the IJ did not make a specific adverse credibility finding. Thus, we take the testimony as true. De Santamaria v. U.S. Att'y Gen., 512 F.3d 1308, 1320 n.10 (11th Cir. 2008).

An alien seeking withholding of removal must show that "it is more likely than not [s]he will be subject to persecution based upon race, religion, nationality, political opinion, or membership in a particular social group." Javier Ruiz v. Gonzales, 479 F.3d 762, 765-766 (11th Cir. 2007). The statute also covers persecution by non-governmental groups that the "government cannot control." Jaime Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257-58 (11th Cir. 2006). The applicant must show either past persecution on a protected ground, which raises a rebuttable presumption of future harm, or show a future threat to her life or freedom based on a protected ground. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

> To qualify for withholding of removal based on persecution by a guerilla group on account of a political opinion, [the alien] must establish that the guerillas persecuted [him] or will seek to persecute [him] in the future because of [his] actual or imputed political opinion. It is not enough to show that [he] was or will be persecuted or tortured due to [his] refusal to cooperate with the guerillas.

Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (citations omitted) (holding that the evidence was "consistent with a finding that FARC harassed [the alien] due to her refusal to cooperate with them, which is not enough to qualify for withholding of removal under the INA"). Moreover, "[e]ven if the evidence compels the conclusion that the petitioner refused to cooperate with the guerrillas because of his political opinion, the petitioner still has to establish that the record

7

also compels the conclusion that he has a 'well-founded fear' that the guerrillas will persecute him because of that political opinion, rather than because of his refusal to cooperate with them." Rivera v. U .S. Att'y Gen., 487 F.3d 815, 822 (11th Cir. 2007) (citation and alteration omitted).

Persecution is an extreme concept, requiring "more than a few isolated incidents of verbal harassment or intimidation ... [and m]ere harassment is not persecution." Javier Ruiz, 479 F.3d at 766. Menacing phone calls and threats are not sufficient evidence of past persecution to require reversal. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). This court has held that threats, attempted attacks, and a physical attack on account of an applicant's political opinion was sufficient evidence of past persecution. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1257-58 (11th Cir. 2007) (asylum context). However, resistance to forced recruitment does not by itself qualify as persecution on account of political opinion. I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481-82, 112 S.Ct. 812, 815-16, 117 L .Ed.2d 38 (1992). Additionally, acts of private violence or failure to cooperate with guerillas "does not constitute evidence of persecution based on a statutorily protected ground." Jaime Ruiz, 440 F.3d at 1257-58. "In assessing past persecution [this court must] consider the cumulative impact of the mistreatment the petitioner [ ] suffered." Mejia, 498 F.3d at 1258; see also, e.g., Ruiz v.

8

Gonzales, 479 F.3d 762, 766 (11th Cir. 2007) (holding that the cumulative effect of a beating, threatening phone calls, and a kidnaping constituted persecution).

Here, we conclude the BIA properly denied relief from removal. First, the incident did not rise to the level of past persecution. See Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1174 (11th Cir. 2008) (holding that a minor beating resulting in only scratches and bruises does not constitute persecution).

Second, the IJ and BIA noted that there were weaknesses in Nunez's claims and thus she needed to present corroborating evidence, a finding that Nunez does not challenge on appeal. Although an applicant's uncorroborated but credible testimony may be sufficient to sustain the burden of proof, "[t]he weaker an applicant's testimony ... the greater the need for corroborative evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). In this case, Nunez provided no relevant corroborating evidence of past persecution. She could not provide hospital records to confirm the alleged beating, and the letters from family and friends were either vague or inconsistent with Nunez's version of the event. Moreover, none of the articles or State Department reports made any reference to the incidents Nunez and her family suffered; the reports merely indicated that FARC was a guerilla organization with strong control in Colombia and well-known for its violent tactics. It is not for this court to re-weigh the evidence. Lorisme v. I.N.S., 129 F.3d 1441, 1445 (11th Cir. 1997).

Third, Nunez failed to establish it is more likely than not she will be persecuted if she returns to Colombia. As the government notes, the family no longer owns the funeral home. Moreover, Nunez's mother and aunt continue to live in Colombia, and Nunez herself traveled to the country twice after the alleged attack. Family members living unharmed in the home country weakens a claim of well-founded fear of future persecution. Jaime Ruiz, 440 F.3d at 1259.

Accordingly, substantial evidence supports the BIA's conclusion, and we DENY the petition.